## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| Michael J. Rego, II, | : | Case No. 3:12 CV 34 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| Commissioner of Social Security, | : | **REPORT AND** |
| Defendant, | : | **RECOMMENDATION** |

### I. INTRODUCTION

Plaintiff Michael J. Rego, II ("Plaintiff") seeks judicial review, pursuant to 42 U.S.C. § 405(g) of Defendant Commissioner's ("Defendant" or "Commissioner") final determination denying his claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1383(c)(3) (Docket No. 1). Pending are the parties' Briefs on the Merits (Docket Nos. 17 and 20). For the reasons that follow, the Magistrate recommends the decision of the Commissioner be affirmed.

### II. PROCEDURAL BACKGROUND

On November 8, 2007, Plaintiff filed an application for SSI under Title XVI of the Social Security Act, 42 U.S.C. § 1381 (Docket No. 11, p. 108 of 409). In his application, Plaintiff alleged a period of disability beginning January 1, 2001 (Docket No. 11, p. 108 of 409). Plaintiff's claims were denied initially on March 20, 2008 (Docket No. 11, p. 50 of 409), and upon reconsideration on July 15,

2008 (Docket No. 11, p. 60 of 409). Plaintiff thereafter filed a timely written request for a hearing on September 20, 2008 (Docket No. 11, p. 71 of 409).

On April 27, 2010, Plaintiff appeared with counsel for a hearing before Administrative Law Judge Matthew Levin ("ALJ Levin") (Docket No. 11, p. 28 of 409). Also appearing at the hearing was an impartial Vocational Expert ("VE") (Docket No. 11, p. 30 of 409). ALJ Levin found Plaintiff to have a severe combination of depression, bipolar disorder, and substance abuse in remission, with an onset date of October 31, 2007 (Docket No. 11, p. 20 of 409)

Despite these limitations, ALJ Levin determined, based on all the evidence presented, that Plaintiff had not been disabled within the meaning of the Social Security Act at any time from the alleged onset date through the date of his decision (Docket No. 11, p. 24 of 409). ALJ Levin found Plaintiff had the residual functional capacity to perform a full range of work at all exertional levels with the following non-exertional limitations:

1.    Limited to performing simple, unskilled work in a low stress environment with limited social interaction

(Docket No. 11, p. 21 of 409). ALJ Levin found Plaintiff retained the ability to concentrate and pay attention in two-hour increments during an eight-hour day (Docket No. 11, p. 21 of 409). Additionally, ALJ Levin found Plaintiff capable of performing his past relevant work as a landscaper (Docket No. 11, p. 23 of 409). Plaintiff's request for benefits was therefore denied (Docket No. 11, p. 23 of 409).

On January 6, 2012, Plaintiff filed a Complaint in the Northern District of Ohio, Western Division, seeking judicial review of his denial of SSI (Docket No. 1). In his pleading, Plaintiff alleged the ALJ's decision was not supported by substantial evidence with regard to either: (1) Plaintiff's ability to engage in his past relevant work; and (2) Plaintiff's residual functional capacity (Docket No. 17). Defendant filed its Answer on April 23, 2012 (Docket No. 10).

2

### III. Factual Background

**A.    The Administrative Hearing**

An administrative hearing convened on April 27, 2010, in Boston, Massachusetts (Docket No. 11, p. 28 of 409). Plaintiff, represented by counsel Stephen Perlmutter, appeared and testified (Docket No. 11, pp. 32-42 of 409). Also present and testifying was VE Charles McBee ("Mr. McBee") (Docket No. 11, pp. 42-47 of 409).

**1.    Plaintiff's Testimony**

At the time of the hearing, Plaintiff was a twenty-seven-year old single male with one year of college education (Docket No. 11, pp. 33-34 of 409). Plaintiff did not have a valid driver's license and resided with his mother in Toledo, Ohio (Docket No. 11, p. 33 of 409). Plaintiff testified that he was financially supported by his mother and food stamps (Docket No. 11, p. 33-34 of 409). Prior to his disability, Plaintiff worked in landscaping (Docket No. 11, p. 34 of 409).

According to Plaintiff, his disability actually began in March or April of 2001 when he was hospitalized for, in Plaintiff's own words, a "psychotic breakdown" (Docket No. 11, p. 34 of 409). At that time, Plaintiff was suffering from hallucinations, "hearing things . . . [and] seeing things that weren't there" (Docket No. 11, p. 40 of 409). Plaintiff subsequently suffered from mania and depression, and continued to have hallucinations two times per month (Docket No. 11, pp. 35, 38, 41 of 409). Plaintiff testified that he was taking Lithium and Risperdal to control his symptoms (Docket No. 11, p. 35 of 409). Although these medications worked to suppress Plaintiff's symptoms, they resulted in numerous side effects. Plaintiff reported suffering from headaches and tremors at least four times a week, severe mood swings, short-term memory losses, and extreme drowsiness (Docket No. 11, p. 35, 37, 39-40 of 409). Plaintiff stated he usually went to bed around midnight and slept until four

3

or five in the afternoon (Docket No. 11, pp. 37, 39-40 of 409). The rest of Plaintiff's day was spent sitting around the house watching television (Docket No. 11, p. 37 of 409).

Plaintiff further testified that he has friends, but does not visit them very often, and occasionally went grocery shopping with his mother (Docket No. 11, pp. 37-38 of 409). Plaintiff stated that he did not engage in any activities outside the house and does not own a computer (Docket No. 11, p. 38 of 409). Plaintiff admitted a history of drug use, including marijuana and LSD, but stated that he had not used in ten or eleven years (Docket No. 11, p. 37 of 409). Plaintiff denied drinking (Docket No. 11, p. 37 of 409).

Plaintiff stated that he had been working with staff at the Zepf Center since 2001, undergoing medication monitoring every four to six weeks and meeting with his treating psychiatrist, Dr. Barbara LaForrest ("Dr. LaForrest"), every eight weeks (Docket No. 11, pp. 35, 39 of 409). When asked by ALJ Levin what would happen if he forgot to take his medication, Plaintiff responded that he "would be really, really high . . . real manic" (Docket No. 11, p. 40 of 409). However, Plaintiff admitted that there had been days when he forgot to take his medications (Docket No. 11, p. 40 of 409). Plaintiff indicated that he wanted to pursue some type of gainful employment if given the opportunity and if his depression symptoms were minimized (Docket No. 11, pp. 38-39 of 409).

## 2.    VOCATIONAL EXPERT TESTIMONY

Having familiarized himself with Plaintiff's file and vocational background prior to the hearing, the VE described Plaintiff's past work as that of a landscape worker (Docket No. 11, p. 43 of 409). According to the VE, this type of work was found in the Dictionary of Occupational Titles ("DOT") under code 406.687-010 with an SVP of two, unskilled, and a medium exertional level (Docket No. 11, p. 43 of 409).  Mr. McBee stated that this type of employment did not require much

social interaction by an employee (Docket No. 11, p. 44 of 409).

> ALJ Levin then posed the following hypothetical:
>
> For someone who has no exertional limitations, but is limited to simple, unskilled, work, performed in a low-stress environment with limited social interaction, and yet who maintains the ability to keep concentration and attention for two-hour increments. What kind of work would that person be able to do?

(Docket No. 11, p. 44 of 409). Taking into account these limitations, the VE testified Plaintiff could return to his past work as a landscaper (Docket No. 11, p. 44 of 409).

The VE then testified that there was also "other work" that could be performed by someone limited by the parameters of the ALJ's hypothetical: (1) hand-packager, listed under DOT 920.587-018, for which there are 80,000 jobs nationally and at least 6,000 in the State of Ohio; (2) floor waxer, listed under DOT 381.687-034, for which there are 300,000 jobs nationally and 75,000 in the State of Ohio; and (3) industrial cleaner, listed under DOT 381.687-018, for which there are 60,000 jobs nationally and 2,500 in the State of Ohio (Docket No. 11, pp. 44-45 of 409).

> On cross-examination, Plaintiff's counsel posed the following question to the VE:
>
> . . . now if a person had significant limitations, and by that I mean limitations that would affect him up to one-third of the time, limitations in completing a normal workday, limitations in working in coordination with other people, limitations in maintaining concentration and attention for an extended period of time, and limitation[s] in sustaining an ordinary work routine without special supervision. Would those limitations affect the jobs, the availability of jobs that you've mentioned?

(Docket No. 11, p. 46 of 409). The VE responded in the affirmative, stating that the limitations, as described, would affect Plaintiff's ability to engage in "other work" (Docket No. 11, p. 46 of 409).

## B.   MEDICAL RECORDS

Plaintiff's medical records regarding his bipolar disorder date back to March 26, 2001, when he was admitted to Rescue Mental Health Services ("RMHS") via an involuntary application (Docket No.

11, pp. 168-70 of 409). According to the application, Plaintiff was experiencing flight of ideas and psychosis and was under the impression that he could read minds (Docket No. 11, p. 168 of 409). Plaintiff admitted to not having eaten for three days (Docket No. 11, p. 169 of 409). RMHS staff tentatively diagnosed Plaintiff with psychotic disorder and admitted him to Flower Hospital in Toledo, Ohio for psychological and pharmacological stabilization (Docket No. 11, pp. 171-72, 180 of 409). Plaintiff participated in psychotherapy and group therapy during his hospitalization but remained in a confused state and was actively hallucinating (Docket No. 11, p. 178 of 409). He was started on a medication routine of Cogentin, Haldol, and Ativan (Docket No. 11, p. 178 of 409). Once stabilized, Plaintiff was discharged on March 30, 2001 (Docket No. 11, p. 178 of 409).

Plaintiff returned to RMHS on April 23, 2001, again stating that he had not eaten or slept in three days (Docket No. 11, p. 166 of 409). Plaintiff was also threatening to harm others and destroy property (Docket No. 11, p. 167 of 409). He refused treatment (Docket No. 11, p. 167 of 409). On April 24, 2001, Plaintiff was referred to Flower Hospital (Docket No. 11, p. 176 of 409). Hospital records indicate that Plaintiff had been off his medication for approximately one week (Docket No. 11, p. 176 of 409). Plaintiff was admitted to Flower Hospital and re-started on Risperdal (Docket No. 11, p. 177 of 409). It was recommended that Plaintiff follow up at the Zepf Community Mental Health Center ("Zepf Center") following his discharge (Docket No. 11, p. 177 of 409). Plaintiff was discharged on April 30, 2001 (Docket No. 11, p. 173 of 409).

On January 3, 2002, Plaintiff began seeing Dr. Bruce A. Montgomery, D.O ("Dr. Montgomery") (Docket No. 11, p. 191 of 409). Plaintiff was still taking the Depakote, Respirdal and Zoloft, and Dr. Montgomery expressed concern that the combination of medications was causing Plaintiff to experience excessive sedation (Docket No. 11, p. 191 of 409). At some point, Plaintiff was

6

switched to Lithium therapy and by July 29, 2002, Dr. Montgomery reported that Plaintiff's bipolar disorder was well controlled by the Lithium (Docket No. 11, p. 189 of 409). This stabilization continued at least until January 2003 (Docket No. 11, p. 187 of 409).

Plaintiff's medical history is replete with records from the Zepf Center dating back to October 12, 2006 (Docket No. 11, pp. 268-312, 324-57, 361-89, 398-407 of 409). These records indicate that Plaintiff's bipolar disorder was fairly well controlled until August 2007 (Docket No. 11, p. 296 of 409). Plaintiff was taking his medication as prescribed and, in May 2007, even reported that he wanted to return to college (Docket No. 11, p. 276 of 409). However, by August 2007, Plaintiff seemed to regress. During an August 13, 2007, appointment at the Zepf Center, Plaintiff reported an increase in his depression symptoms and difficulty focusing (Docket No. 11, p. 296 of 409). Plaintiff indicated that he felt unable to return to work or school (Docket No. 11, p. 296 of 409).

On October 24, 2007, Zepf Center records indicate that Plaintiff had to be brought in by his mother because he refused to come (Docket No. 11, p. 293 of 409). Plaintiff was unfocused and was blaming his problems on other people (Docket No. 11, p. 293 of 409). He also blamed his failure to attend some of his Zepf Center appointments on the fact that he sleeps all day (Docket No. 11, p. 293 of 409). By March 18, 2008, Plaintiff appeared very anxious and manic, and was hyper-verbal with his flight of ideas (Docket No. 11, p. 374 of 409). Subsequent records indicate Plaintiff's improvement, which continued through May 2010 (Docket No. 11, pp. 363-70 of 409).

C.   **EVALUATIONS**

On April 20, 2001, Plaintiff underwent a bio-psychosocial diagnostic assessment with Dr. Jeffrey Long, M.Ed ("Dr. Long") (Docket No. 11, p. 310 of 409). Dr. Long wondered whether the recent death of Plaintiff's grandfather had prompted Plaintiff's psychotic issues (Docket No. 11, p. 310

7

of 409). He recommended psychiatric treatment and medication management (Docket No. 11, p. 311 of 409). On May 2, 2001, Dr. Barbara Funke, M.D ("Dr. Funke") conducted a psychiatric history and evaluation of Plaintiff (Docket No. 11, p. 306 of 409). Dr. Funke found Plaintiff to be alert and oriented and of average intelligence (Docket No. 11, p. 307 of 409). Dr. Funke concluded that Plaintiff had most likely suffered a psychotic episode and was possibly struggling with the beginnings of bipolar disorder with psychotic features (Docket No. 11, p. 307 of 409). She recommended medication and therapy (Docket No. 11, p. 308 of 409).

On January 8, 2008, Dr. Funke, now known as Dr. LaForrest, conducted a Mental Status Questionnaire as part of her treatment of Plaintiff (Docket No. 11, p. 207 of 409). Dr. LaForrest indicated that Plaintiff had difficulty concentrating and became easily overwhelmed and frustrated (Docket No. 11, pp. 207-08 of 409). She also reported that Plaintiff was sensitive to criticism and tended to get irritable when faced with criticism (Docket No. 11, p. 208 of 409). Dr. LaForrest also indicated that Plaintiff was able to remember, understand, and follow simple directions, and could maintain attention (Docket No. 11, p. 208 of 409). However, she opined that Plaintiff may have difficulty handling simple routine or repetitive tasks (Docket No. 11, p. 208 of 409).

On March 9, 2008, state examiner Dr. Carl Tishler, Ph.D ("Dr. Tishler") conducted both a Psychiatric Review Technique and a Mental Residual Functional Capacity Assessment of Plaintiff (Docket No. 11, p. 212 of 409). Dr. Tishler found Plaintiff to be suffering from bipolar disorder with psychotic features (Docket No. 11, p. 215 of 409). With regard to "paragraph B" criteria, Dr. Tishler indicated that Plaintiff had a mild restriction of the activities of daily living and moderate difficulty in

maintaining social functioning, concentration, persistence, and pace[1] (Docket No. 11, pp. 222-23 of 409). He found no indication of episodes of decompensation or "paragraph C" criteria (Docket No. 11, pp. 222-23 of 409).

With regard to the Mental Residual Functional Capacity Assessment, Dr. Tishler found that Plaintiff had no "marked" limitations but suffered from several "moderate" limitations, including his ability to:

1.   Understand and remember detailed instructions
2.   Carry out detailed instructions
3.   Maintain attention and concentration for extended periods
4.   Perform activities within a schedule, maintain regular attendance, and be punctual
5.   Sustain an ordinary routine without special supervision
6.   Work in coordination with or proximity to others without being distracted
7.   Complete a normal workday and workweek and perform at a consistent pace
8.   Accept instructions and respond appropriately to criticism from supervisors
9.   Get along with coworkers without distracting them or acting out
10.  Respond appropriately to changes in the workplace

(Docket No. 11, pp. 226-27 of 409). Dr. Tishler concluded that Plaintiff retained "the capacity to work in a low-stress environment that does not require sustained concentration, attention, or persistence, [could only do] work that does not require more than superficial contact with the general public and/or co-workers, [and could only do work that] involves simple one-two step instruction[s] with sporadic routines and tasks" (Docket No. 11, p. 228 of 409).

---

[1] The Social Security Administration arranges mental disorders into nine diagnostic categories. Each category consists of two sets of criteria that a claimant must satisfy in order to prove her disability: (1) a statement describing the disorder or disorders addressed by the listing, commonly referred to as "paragraph A" criteria; and (2) a set of impairment-related functional limitations, commonly referred to as "paragraph B" criteria. 20 C.F.R. § 404, Subpart P, Appendix 1, §12.00(A). Some of the categories, including § 12.04, also include another set of functional criteria, commonly known as "paragraph C" criteria. 20 C.F.R. § 404, Subpart P, Appendix 1, § 12.00(A). Paragraph A criteria "substantiate medically the presence of a particular mental disorder" using specific symptoms, signs, and laboratory findings. 20 C.F.R. § 404, Subpart P, Appendix 1, § 12.00(A). Paragraph B and C criteria "describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity." 20 C.F.R. § 404, Subpart P, Appendix 1, § 12.00(A).

On May 25, 2010, Dr. LaForrest completed a Medical Source Statement with regard to Plaintiff (Docket No. 11, p. 408 of 409). Dr. LaForrest indicated that Plaintiff suffered from moderate limitations in five categories: (1) ability to maintain attention and concentration; (2) ability to perform work activities at a reasonable pace; (3) ability to interact appropriately with others; (4) ability to withstand the stresses and pressure of routine simple, unskilled work; and (5) ability to make judgments that are commensurate with the functions of unskilled work (Docket No. 11, pp. 408-09 of 409). Dr. LaForrest found Plaintiff to have a marked limitation with regard to keeping a regular work schedule and maintaining punctual attendance (Docket No. 11, p. 409 of 409). She found that Plaintiff could remember, follow, and understand simple directions, but still became easily overwhelmed and frustrated (Docket No. 11, pp. 408-09 of 409).

## IV. STANDARD OF DISABILITY

The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical for purposes of this case, and are found at 20 C.F.R. §§ 404.1520 and 416.920. *Colvin v. Barnhart,* 475 F.3d 727, 730 (6th Cir. 2007). DIB and SSI are available only for those who have a "disability." 42 U.S.C. § 423(a), (d); *see also* 20 C.F.R. § 416.920. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Colvin*, 475 F.3d at 730 (*citing* 42 U.S.C. § 423(d)(1)(A)) (definition used in the DIB context); *see also* 20 C.F.R. § 416.905(a) (same definition used in the SSI context).

The Commissioner uses a five-step sequential evaluation process to evaluate a DIB or SSI claim. First, a claimant must demonstrate he is not engaged in "substantial gainful activity" at the time

10

he seeks disability benefits. *Colvin*, 475 F.3d at 730 (*citing Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)).  Second, a claimant must show he suffers from a "severe impairment." *Colvin*, 475 F.3d at 730. A "severe impairment" is one which "significantly limits . . .  physical or mental ability to do basic work activities." *Id.* (*citing Abbott,* 905 F. 2d at 923).  At the third step, a claimant is presumed to be disabled regardless of age, education, or work experience if he is not engaged in substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets the requirements of a "listed" impairment. *Colvin*, 475 F.3d at 730.

Prior to considering step four, the Commissioner must determine a claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(e), 416.920(e). An individual's residual functional capacity is an administrative "assessment of [the claimant's] physical and mental work abilities – what the individual can or cannot do despite his or her limitations." *Converse v. Astrue*, 2009 U.S. Dist. LEXIS 126214, *16 (S.D. Ohio 2009); *see also* 20 C.F.R. § 404.1545(a). It "is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a **regular and continuing** basis . . . A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Converse*, 2009 U.S. Dist. LEXIS 126214 at *17 (*quoting SSR* 96-8p, 1996 SSR LEXIS 5 (July 2, 1996) (emphasis in original) (internal citations omitted)).The Commissioner must next determine whether the claimant has the residual functional capacity to perform the requirements of his past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). If he does, the claimant is not disabled.

Finally, even if the claimant's impairment does prevent him from doing past relevant work, the claimant will not be considered disabled if other work exists in the national economy that he can perform.  *Colvin*, 475 F.3d at 730 (*citin*g *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir.

11

2001) (internal citations omitted) (second alteration in original)). A dispositive finding by the

Commissioner at any point in the five-step process terminates the review. *Colvin*, 475 F.3d at 730

(*citing* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)).

## V. THE COMMISSIONER'S FINDINGS

After careful consideration of the disability standards and the entire record, ALJ Levin made

the following findings:

1. Plaintiff has not engaged in substantial gainful activity since October 31, 2007, the application date.

2. Plaintiff has the following severe impairments: depression, bipolar disorder, and substance abuse which is in remission.

3. Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1.

4. Plaintiff has the residual functional capacity to perform a full range of work at all exertional levels but with non-exertional limitations including only performing simple, unskilled work in a low-stress environment with limited social interaction. Plaintiff is capable of concentrating and paying attention in two-hour increments during an eight-hour day.

5. Plaintiff is capable of performing his past relevant work as a landscaper since this work does not require the performance of work-related activities precluded by his residual functional capacity.

6. Plaintiff has not been under a disability, as defined by the Social Security Act, since October 31, 2007, the date the application was filed.

(Docket No. 11, pp. 18-24 of 409). ALJ Levin denied Plaintiff's request for SSI benefits (Docket No.

11, p. 24 of 409).

## VI. STANDARD OF REVIEW

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42

U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).  *McClanahan v. Comm'r of Soc. Sec.,* 474 F.3d 830, 832-

33 (6th Cir. 2006).  In conducting judicial review, this Court must affirm the Commissioner's conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact that are unsupported by substantial evidence.  *Id.* (*citing Branham v. Gardner*, 383 F.2d 614, 626-27 (6th Cir. 1967)).  "The findings of the [Commissioner] as to any fact if supported by substantial evidence shall be conclusive . . ." *McClanahan*, 474 F.3d at 833 (*citing* 42 U.S.C. § 405(g)). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *McClanahan*, 474 F.3d at 833 (*citing Besaw v. Sec'y of Health and Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992)).  "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion . . . This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *McClanahan*, 474 F.3d at 833 (*citing Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted)).

## VII. DISCUSSION

### A.   PLAINTIFF'S ALLEGATIONS

In his Brief on the Merits, Plaintiff alleges the ALJ's decision was not supported by substantial evidence with regard to either: (1) Plaintiff's ability to engage in his past relevant work as a landscaper; or (2) Plaintiff's residual functional capacity (Docket No. 17).

### B.   DEFENDANT'S RESPONSE

Defendant contends: (1) any error related to the ALJ's assessment of Plaintiff's past relevant work was harmless; (2) the ALJ reasonably weighed the opinion of Plaintiff's treating physician; and (3) the ALJ reasonably weighed the opinion of the state agency psychologist (Docket No. 20).

13

## C.    DISCUSSION

For purposes of analysis, the Magistrate finds that Plaintiff's second assignment of error is actually two-fold, alleging error with regard to both a determination of Plaintiff's residual functional capacity *and* a violation of the treating physician rule. This report and recommendation proceeds accordingly.

### 1.    PAST RELEVANT WORK

Plaintiff contends the ALJ erred by determining that Plaintiff could return to his "past relevant work" as a landscaper (Docket No. 17, p. 8 of 18). Specifically, Plaintiff alleges that his prior work as a landscape worker does not rise to the level of "substantial gainful activity," as required by the Social Security Regulations (Docket No. 17, p. 9 of 18). Defendant disagrees and argues that even if the ALJ did err in his determination, such error was harmless (Docket No. 20, p. 7 of 15).

Under step four of the sequential evaluation process, the ALJ must determine whether a claimant has the residual functional capacity to perform the requirements of his past relevant work. 20 C.F.R. § 416.920(a)(4)(iv). The term "past relevant work" means work performed, either as the claimant actually performed it or as it is generally performed in the national economy, "within the past [fifteen] years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn to do it." 20 C.F.R. § 416.960(b)(1). Therefore, prior to determining a claimant's ability to engage in his past relevant work, the ALJ must determine whether the claimant is currently engaging in, or has engaged in, substantial gainful activity at any time since the alleged onset date of disability. 20 C.F.R. § 416.920(b). Under 20 C.F.R. § 416.972, substantial gainful activity is "work activity that is both substantial and gainful." The Social Security Regulations define these terms as follows:

> (a)    Substantial work activity is work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time

14

basis or if you do less, get paid less, or have less responsibility than when you worked before.

(b)     Gainful work activity is work activity that you do for pay or profit. Work activity is gainful if it is the kind of work usually done for pay or profit, whether or not a profit is realized.

20 C.F.R. § 416.972(a)-(b). If an individual has earnings from employment or self-employment above a specific level set out in the Social Security Regulations, he is not disabled regardless of how severe his physical or mental impairments are and regardless of his age, education, and work experience. 20 C.F.R. § 416.920(b).

The Social Security Regulations set forth yearly earnings thresholds to be used in determining whether a claimant is or was engaged in substantial work activity. 20 C.F.R. § 416.974. A claimant's monthly earnings will be averaged for purposes of analysis. 20 C.F.R. § 416.974(b)(3)(i). If this average is less than the threshold required by the Social Security Regulations, the ALJ "will generally consider that the earnings from [the claimant's] work as an employee . . . will show that [the claimant] has not engaged in substantial gainful activity." 20 C.F.R. § 416.974(b)(3)(i).

Plaintiff was employed as a landscape worker from September 1999 through October 2000 (Docket No. 11, p. 121 of 409). Plaintiff earned $1,428 in 1999 and $909 in 2000 for a total of $2,337 over these thirteen months (Docket No. 11, p. 111 of 409). Plaintiff therefore made an average of $180 per month. From July 1999 through December 2000, the Social Security Regulations set the earning eligibility threshold at $700 per month. 20 C.F.R. § 416.974(b)(2)(Table 1). Plaintiff was clearly at substantially less than the level required to find substantial gainful activity. As such, Plaintiff was not, nor had he ever been, engaged in substantial gainful activity. Therefore,  Plaintiff had no "past relevant work," as defined by the Social Security Administration, of which to return. The ALJ should have proceeded to step five of the sequential evaluation process to determine whether Plaintiff is able to do

15

any "other work," considering his residual functional capacity, age, education, and work experience. 20 C.F.R. § 416.920(g). Instead, ALJ Levin found Plaintiff to be capable of returning to what the ALJ described as Plaintiff's "past relevant work" as a landscaper (Docket No. 11, p. 24 of 409). This erroneous determination denied Plaintiff the opportunity of an official step five analysis.

Defendant would have this Magistrate believe that the ALJ's failure to conduct an official step five analysis is simply harmless error (Docket No. 20, p. 8 of 15). Based on the facts of the situation as well as relevant case law, the Magistrate agrees. Under step five, an ALJ must determine whether a claimant is able to do any *other* work, considering his residual functional capacity, age, education, and work experience. If the claimant is able to do other work, he is not disabled. 20 C.F.R. § 416.912(g). Typically the ALJ will actually pose this question to the vocational expert in the form of a hypothetical (i.e. based on the following limitations, is the claimant capable of performing other work in the economy?"). Here, ALJ Levin failed to do so and rather asked, following his one and only hypothetical question, "what kind of work would that person be able to do?" (Docket No. 11, p. 44 of 409). This prompted the VE to not only opine about Plaintiff's ability to return to his past relevant work, but also to offer potential *other* work, including DOT numbers, that Plaintiff could perform given his limitations (Docket No. 11, pp. 44-45 of 409). The VE provided uncontested testimony that Plaintiff could seek work in a variety of areas including: (1) hand-packager, DOT 920.587-018, for which there are 80,000 positions nationally and at least 6,000 in the State of Ohio; (2) floor waxer, DOT 381.687-034, for which there are 300,000 positions nationally and approximately 75,000 in the State of Ohio; and (3) industrial cleaner, DOT 381.687-018, for which there are 60,000 positions nationally and at least 2,500 in the State of Ohio (Docket No. 11, pp. 44-45 of 409).

Generally, decisions of administrative agencies are reviewed for harmless error. *Rabbers v.*

16

*Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) (*citing Heston v. Comm'r of Soc. Sec.*, 245

F.3d 528, 535 (6th Cir. 2001)). Courts "are not required to convert judicial review of agency action

into a ping-pong game where remand would be an idle and useless formality." *Rabbers*, 582 F.3d at

654 (*citing NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n. 6 (1969)). Even though the ALJ failed

to officially conduct a step five analysis, information and testimony regarding the answer to that

question, had it been asked, is included in the record. Therefore, the Magistrate finds that any error

committed by the ALJ during his sequential evaluation to be harmless and recommends the ALJ's

opinion be affirmed.

### 2.    RESIDUAL FUNCTIONAL CAPACITY

In his second claim, Plaintiff alleges the ALJ erred when he determined Plaintiff was capable

of performing a reduced range of "light" work (Docket No. 17, pp. 9-18 of 18). To properly determine

a claimant's ability to work and the corresponding level at which that work may be performed, the ALJ

must determine the claimant's residual functional capacity. *Webb v. Comm'r of Soc. Sec.*, 368 F.3d

629, 633 (6th Cir. 2004). According to Social Security Regulations, residual functional capacity is

designed to describe the claimant's physical and mental work abilities. *Id*. Residual functional capacity

is an administrative "assessment of [the claimant's] physical and mental work abilities – what the

individual can or cannot do despite his or her limitations." *Converse v. Astrue*, 2009 U.S. Dist. LEXIS

126214, *16 (S.D. Ohio 2009); *see also* 20 C.F.R. § 404.1545(a). Residual functional capacity "is the

individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on

a **regular and continuing** basis . . . A regular and continuing basis means 8 hours a day, for 5 days a

week, or an equivalent work schedule." *Converse*, 2009 U.S. Dist. LEXIS 126214 at *17 (*quoting SSR*

*96-8p*, 1996 SSR LEXIS 5 (July 2, 1996) (emphasis in original) (internal citations omitted)).

To determine a claimant's residual functional capacity, the Commissioner will make an assessment based on all relevant medical and other evidence. 20 C.F.R. § 20.1545(a)(3). Before making a final determination a claimant is not disabled, the Commissioner bears the responsibility of developing the claimant's complete medical history. 20 C.F.R. § 20.1545(a)(3). The Commissioner "will consider any statements about what [a claimant] can still do that have been provided by medical sources, whether or not they are based on formal medical examinations. [The Commissioner] will also consider descriptions and observations of [a claimant's] limitations from [his] impairment(s), including limitations that result from [his] symptoms, such as pain, provided by [claimant], [his] family, neighbors, friends, or other persons." 20 C.F.R. § 20.1545(a)(3). Responsibility for deciding residual functional capacity rests with the ALJ when cases are decided at an administrative hearing. *Webb*, 368 F.3d at 633.

In the present case, ALJ Levin found, upon consideration of the entire record, that Plaintiff had the residual functional capacity to perform light work as defined in 20 C.F.R. §§ 416.927 and 416.929 (Docket No. 10, p. 20 of 490). The ALJ found that Plaintiff

> has a residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: he is limited to performing simple-unskilled work performed in a low stress environment with limited social interaction. He retains the ability to concentrate and pay attention in [two] hour increments during an [eight]-hour day.

(Docket No. 11, p. 21 of 409).

The ALJ based his residual functional capacity determination upon the following:

> I was unable to find any medical evidence that supported the claimant's allegation that he was totally disabled. Relevant progress and treatment notes from January of 2007, until May of 2009, consistently revealed that the claimant had poor follow through and lack of focus, which his treatment providers determined were moderate limitations. There is no evidence throughout this treatment period that the claimant was in therapy or received anything more than medication from his providers.

18

Treating physician, Dr. LaForrest consistently noted that the claimant was pleasant; his speech was non-pressured, spontaneous, articulate and coherent; his though[t] processes were organized and goal-directed with no overt delusional thinking; the absence of hallucinations, suicidal ideation, or thoughts of harm to others; and the absence of extrapyramidal symptoms or dyskinetic movements . . . Dr. LaForrest concluded the claimant was able to remember, understand, and follow simple directions; maintain attention for short periods, possessed average intelligence, had no significant memory problems, was fully oriented, and only had concentration problems when he experienced racing thoughts.

I have considered the claimant's impairments and am not persuaded by his statements concerning his impairments and their impact on his ability to work. I find that the claimant is not fully credible; as a result, his subjective symptoms are given limited weight. Therefore I find that the record does not support the claimant's allegation of debilitating mental impairments.

I am not persuaded by the opinion evidence of Dr. LaForrest because the course of treatment pursued by her has not been consistent with what one would expect if the claimant were truly disabled. Further, I find that the doctor after [seven] years of treatment noted only moderate limitations, which suggests the claimant is not truly disabled. Dr. LaForrest's opinion is without substantial support from the other evidence of record, which renders it less persuasive.

. . . I have carefully considered the state agency medical opinion of Dr. Tishler, the non-examining psychological consultant. The conclusion reached by Dr. Tishler supports a finding of not disabled. Although Dr. Tishler was a non-examining psychologist, he is accorded significant weight, particularly in the instant case, where there exists consistent medical and testimonial evidence to reach similar conclusions as explained throughout this decision.

(Docket No. 11, pp. 22-23 of 409).

ALJ Levin stated his residual functional capacity determination was supported by Plaintiff's medical records from both Dr. LaForrest and Dr. Tishler as well as Plaintiff's own testimony (Docket No. 11, p. 23 of 409). The ALJ also relied upon the testimony of the VE, Mr. McBee, who testified that Plaintiff, even under the ALJ's specified limitations, could return to his past employment as a landscaper at the medium exertional level, as that term is defined by Social Security Administration Regulations, as well as engage in "other work" (Docket No. 11, pp. 23-24 of 409).

19

Plaintiff alleges he is not capable of performing substantial gainful activity at any exertional level (Docket No. 17, p. 10 of 18). To support this claim, Plaintiff points to the opinion of his treating psychiatrist, Dr. LaForrest (Docket No. 17, pp. 11-12 of 18). Defendant disagrees, stating that many of the opinions and observations of Dr. LaForrest are consistent with the ALJ's finding (Docket No. 20, p. 8 of 15).

In Social Security cases,

a court's review of the [ALJ's] decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence. The substantial-evidence standard is met if a reasonable mind might accept the relevant evidence as adequate to support a conclusion. The substantial-evidence standard presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts. Therefore, if substantial evidence supports the ALJ's decision, the court defers to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion.

*Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405-06 (6th Cir. 2009). While Plaintiff may disagree with ALJ Levin's findings with regard to residual functional capacity, the Magistrate finds the ALJ's conclusions to be well within the "zone of choice" based upon the supplied evidence.

Dr. LaForrest's 2007 Mental Functional Capacity Assessment evaluation revealed that Plaintiff had, at worst, only moderate limitations in some assessed categories (Docket No. 11, pp. 359-60 of 409). Her February 2008 Mental Status Questionnaire found Plaintiff to have: (1) non-pressured speech that was spontaneous, articulate, and coherent; (2) appropriate affect; (3) organized thought processes; (4) clear orientation to person, place, and time; (5) average intelligence with no significant memory problems; (6) the ability to remember, understand, and follow simple directions; and (7) the ability to maintain attention (Docket No. 11, pp. 207-09 of 409). Dr. LaForrest's May 2010 Mental Source Statement concerning Plaintiff accorded only moderate limitations with regard to: (1) maintaining attention and concentration for two-hour periods of time; (2) performing work activities at

20

a reasonable pace; (3) interacting appropriately with others; (4) withstanding the stresses and pressures of routine simple unskilled work; and (5) making judgments commensurate with the functions of unskilled work (Docket No. 11, pp. 408-09 of 409).

State agency psychologist Dr. Tishler also conducted a Mental Residual Functional Capacity Assessment of Plaintiff (Docket No. 11, pp. 226-29 of 409). Under the Social Security Regulations, an ALJ

> *will* consider residual functional capacity assessments made by State agency medical and psychological consultants, medical and psychological experts . . . , and other program physicians and psychologists to be 'statements about what [a claimant] can still do' made by non-examining physicians and psychologists based on their review of the evidence in the case record.

20 C.F.R. § 404.1513(c) (emphasis added). Dr. Tishler's 2008 assessment of Plaintiff revealed that Plaintiff had only moderate limitations in ten of the twenty assessed categories, while the remaining categories had no significant limitation (Docket No. 11, pp. 226-27 of 409). Further, Dr. Tishler concluded that Plaintiff "retain[ed] the capacity to work in a low-stress environment that does not require sustained concentration, attention, or persistence . . . [and] that does not require more than superficial contact with the general public and or co-workers, and that only involves simple one-two step instruction[s] with sporadic routines and tasks" (Docket No. 11, p. 228 of 409).

This is not to say that Dr. LaForrest and Dr. Tishler did not find Plaintiff to be totally without limitation. Both doctors found Plaintiff gets easily overwhelmed (Docket No. 11, pp. 207, 228, 360, 409 of 409), has problems with concentration when experiencing racing thoughts (Docket No. 11, pp. 207-08, 228, 409 of 409), and is sensitive to criticism (Docket No. 11, pp. 208, 228 of 409). However, when placed in context with Plaintiff's medical records as a whole, ALJ Levin's determination of Plaintiff's residual functional capacity is still reasonable and well within his "zone of choice."

Therefore, the Magistrate finds Plaintiff's assignment of error with regard to residual functional capacity to be without merit and recommends the ALJ's opinion be affirmed.

### 3. TREATING PHYSICIAN RULE

Also included in Plaintiff's second assignment of error regarding an improper residual functional capacity is his allegation that ALJ Levin failed to accord proper weight to the opinion of Plaintiff's treating physician, Dr. LaForrest (Docket No. 17, pp. 10-17 of 18).

The Sixth Circuit provided a detailed summary of the treating physician rule in *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009). According to the Court, the treating physician rule:

> requires the ALJ to generally give greater deference to the opinions of treating physicians than to the opinions of non-treating physicians because these sources are likely to be the medical professional most able to provide a detailed, longitudinal picture of the claimant's medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (*quoting* 20 C.F.R. § 404.1527(d)(2)).

> The ALJ must give a treating source opinion controlling weight if the treating source opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record. *Wilson*, 378 F.3d at 544. On the other hand . . . it is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent . . . with other substantial evidence in the case record. *SSR* 96-2p, 1996 SSR LEXIS 9 at *5 (July 2, 1996). If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician. *Wilson*, 378 F.3d at 544.

> [T]he regulations require the ALJ to always give good reasons in the notice of determination or decision for the weight given to the claimant's treating source's opinion. 20 C.F.R. § 404.1527(d)(2). Those good reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers

22

the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight. *SSR* 96-2p, 1996 SSR LEXIS 9 at *12.

*Blakley*, 581 F.3d at 406-07 (internal quotations omitted).

Here, there is no question that Dr. LaForrest is Plaintiff's treating physician; the ALJ admits as much in his opinion (Docket No. 11, p. 23 of 409). Because of this status, Dr. LaForrest's opinion is entitled to controlling weight. *See Blakley*, 581 F.3d at 406. To assign anything less requires the ALJ to specifically determine and state the amount of weight given to the opinion, based on the factors iterated in *Blakley*, originally set forth in 20 C.F.R. § 404.1527(d)(2): (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) supportability of the opinion, (4) consistency of the opinion with the record as a whole, and (5) any specialization of the treating physician.

Essentially, ALJ Levin completely discounted the opinion of Dr. LaForrest, stating her opinion was "without substantial support from the other evidence of record, which renders it less persuasive" (Docket No. 11, p. 23 of 409). Therefore, under the Social Security Regulations, ALJ Levin was required to specifically state: (1) what weight he was giving Dr. LaForrest's opinion by balancing the aforementioned factors; and (2) the reasons why he was not giving the opinion controlling weight.

Although the ALJ failed to state what weight he was giving Dr. LaForrest's opinion, he did provide sufficient documentation of his analysis and reasoning. The ALJ took note of Plaintiff's seven-year history with Dr. LaForrest, although he failed to discuss in any detail the number of times Plaintiff was seen by Dr. LaForrest or the nature and extent of the doctor/patient relationship (Docket No. 11, pp. 21-23 of 409). ALJ Levin also discussed the overall supportability of Dr. LaForrest's opinion and consistency of that opinion with the record as a whole. In according Dr. LaForrest's opinion less weight, the ALJ cited the doctor's own findings that Plaintiff "was pleasant; his speech was non-

23

pressured, spontaneous, articulate and coherent; his though[t] processes were organized and goal-directed with no overt delusional thinking; the absence of hallucinations, suicidal ideation, or thoughts of harm to others; and the absence of extrapyramidal symptoms or dyskinetic movements" (Docket No. 11, p. 23 of 409). Dr. LaForrest also found Plaintiff was "able to remember, understand, and follow simple directions; maintain attention for short periods, possessed average intelligence, had no significant memory problems, was fully oriented, and only had concentration problems when he experienced racing thoughts" (Docket No. 11, p. 23 of 409). Furthermore, the ALJ found that Dr. LaForrest's pursued course of treatment was not consistent "with what one would expect if the claimant were truly disabled," especially since Dr. LaForrest found Plaintiff to suffer from only "moderate" limitations (Docket No. 11, p. 23 of 409).

ALJ Levin also noted the findings of Dr. Tishler which supported finding Plaintiff "not disabled." Specifically, ALJ Levin mentioned that Dr. Tishler concluded Plaintiff's "mental impairments did not meet Listing 12.04 because his depression/bipolar disorder only produced mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace functioning, and no episodes of decompensation" (Docket No. 11, p. 20 of 409).

As stated above, "the regulations require the ALJ to always give good reasons in the notice of determination or decision for the weight given to the claimant's treating source's opinion." *Blakley*, 581 F.3d at 406-07 (*citing* 20 C.F.R. § 404.1527(d)(2)). These good reasons must be supported by evidence contained in the record. *Blakley*, 581 F.3d at 406-07. Here, ALJ Levin provided good reasons for according the opinion of Plaintiff's treating physician, Dr. LaForrest, less than controlling weight. These reasons were supported by evidence contained in the record, even within Dr. LaForrest's own

opinions. Therefore, the Magistrate finds that the ALJ reasonably weighed the opinion of Plaintiff's treating physician based on substantial evidence contained in the record and recommends the ALJ's opinion be affirmed.

## VIII. CONCLUSION

For the foregoing reasons, this Magistrate recommends that the decision of the Commissioner be affirmed.

/s/Vernelis K. Armstrong
United States Magistrate Judge

Date:   November 28, 2012

## IX. NOTICE

Please take notice that as of this date the Magistrate's report and recommendation attached hereto has been filed. Pursuant to Rule 72.3(b) of the LOCAL RULES FOR NORTHERN DISTRICT OF OHIO, any party may object to the report and recommendations within fourteen (14) days after being served with a copy thereof. Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure. The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. Any party may respond to another party's objections within fourteen days after being served with a copy thereof.

Please note that the Sixth Circuit Court of Appeals determined in *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981) that failure to file a timely objection to a Magistrate's report and recommendation foreclosed appeal to the court of appeals. In *Thomas v. Arn*, 106 S.Ct. 466 (1985), the

25

Supreme Court upheld that authority of the court of appeals to condition the right of appeal on the filing of timely objections to a report and recommendation.